**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| EMED TECHNOLOGIES CORPORATION, ET AL, § § § § § *Plaintiffs,* § § v. § § REPRO-MED SYSTEMS, INC., § § *Defendant.* § § | Case No. 2:15-CV-1167-JRG-RSP |

## CLAIM CONSTRUCTION MEMORANDUM OPINION AND ORDER

On February 20, 2019, the Court held a hearing to determine the proper construction of the disputed claim terms in United States Patent No. 8,961,476 ("the '476 Patent"). Having considered the arguments made by the parties at the hearing and in the parties' claim construction briefing (Dkt. Nos. 98, 101, and 102), having considered the intrinsic evidence, and having made subsidiary factual findings about the extrinsic evidence, the Court hereby issues this Claim Construction Memorandum and Order. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

## TABLE OF CONTENTS

| | | |
|---|---|---:|
| I. | BACKGROUND | 3 |
| II. | APPLICABLE LAW | 5 |
| III. | CONSTRUCTION OF AGREED TERMS | 10 |
| IV. | CONSTRUCTION OF DISPUTED TERMS | 16 |
| | 1. "groove" | 16 |
| V. | CONCLUSION | 19 |

## I. BACKGROUND

The '476 Patent was filed on March 21, 2014, issued on February 24, 2015, and is titled "Sharps Protector Device for Protecting a User From a Sharp Tip of a Medical Needle." The '476 Patent relates to a device that protects a person from a needle tip, which could be a "significant hazard" when it is "contaminated with blood or other fluids from the patient." '476 Patent at 1:32–33. Figure 10 illustrates an embodiment of the device that includes a central body portion 202 in fluid connection with a delivery tube 204, medical needle 206, and a pair of wings 216, 218. *Id.* at 4:62–5:5. The figure also illustrates a mechanical fastener "having a lip and a recessed portion configured to engage for attachment with one another, and with a groove sized to house the medical needle."[1] *Id.* at 3:62–65.



FIGURE 10

---

[1] The patent owner argued to the PTAB in the IPR of the '476 Patent that the "claims issued in the '476 patent *only* cover the embodiments of Figure 10 and 11." (Dkt. No. 101-9 at 6-7) (emphasis added); *see also*, *id.* at 7 ("If you start with the claims as originally filed in the application at issue in the '476 patent, those were directed *solely* to the embodiments of Figures 10 and 11.") (emphasis added).

*Id.* at Figure 10. Specifically, device 1000 "may include a mechanical fastener 1024 with one or both of the wings 216, 218 forming a recessed portion 1038 adjacent a perimeter 1040." *Id.* at 6:19–22. The specification further states that "[m]echanical fastener 1024 may also include a lip 1042 extending from at least a portion of perimeter 1040 of one or both of the wings 216, 218." *Id.* at 6:22–24. The specification adds that "[r]ecessed portion 1038 and lip 1042 may be configured to engage with one another to selectively attach the pair of wings 216, 218 together with medical needle 206 positioned between wings 216, 218." *Id.* at 6:24–27. It is "[t]his attachment of the wings 216, 218 [that] protects a user from sharp tip 212 of medical needle 206." *Id.* at 6:27–29.

Claims 1, 8, and 9 of the '476 Patent recite the following elements (disputed term in italics)[2]:

> 1. A device for protecting a user from a sharp tip of a medical needle, the device comprising:
> a central body portion;
> the medical needle having a first end in fluid connection with a delivery tube, and a second end distal from the central body portion including the sharp tip;
> a pair of wings, each wing of the pair of wings having an inner region and an outer region, the inner region of each wing in attachment to the central body portion, the outer region of each wing extending away from the central body portion, the pair of wings disposed in opposition to one another with the medical needle positioned *therebetween*, and the pair of wings being selectively positionable from an open position to a closed position, where the wings in the open position are spaced apart from each other to expose the medical needle to allow placement of the medical needle into a treatment site and delivery of a medicinal fluid, and wherein the wings in the closed position cover the medical needle to protect against accidental needle stick injury from the medical needle;
> *a mechanical fastener* disposed on at least one wing of the pair of wings, *the mechanical fastener configured to selectively*

---

[2] On January 12, 2017, the PTAB invalidated independent claim 1 and dependent claims 2-8 and 10 of the '476 Patent. (Patent Tr. & App. Bd. Jan. 12, 2017) (the "IPR") (Dkt. No. 55-1). The only remaining claim is dependent claim 9.

> *attach the pair of wings together* with the medical needle positioned *therebetween* so as to protect against accidental needle stick injury from the sharp tip of the medical needle;
> *the mechanical fastener including a lip extending along at least a portion of a perimeter of at least one wing of the pair of wings*, and *a mating portion along a perimeter of at least one other wing of the pair of wings, and wherein the mating portion and the lip are configured to align the at least one wing relative to the at least one other wing in the closed position*.

> 8. The device in accordance with claim 1, wherein at least one of the pair of wings is formed with a *groove having a size configured for housing at least a portion of the medical needle* when the pair of wings are in the closed position.

> 9. The device in accordance with claim 8, *wherein the groove is formed in a single one of the pair of wings*.

## II. APPLICABLE LAW

### A. Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure*

*Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") (vacated on other grounds).

"The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is

improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alternatives, Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read

claim terms." *Id*. The Supreme Court recently explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

### B. Departing from the Ordinary Meaning of a Claim Term

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution."[3] *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Solutions*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669

---

[3] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.") "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013); *see also Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1045 (Fed. Cir. 2016) ("When the prosecution history is used solely to support a conclusion of patentee disclaimer, the standard for justifying the conclusion is a high one.").

Although a statement of lexicography or disavowal must be exacting and clear, it need not be "explicit." *See Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1364 (Fed. Cir. 2016) ("a patent applicant need not expressly state 'my invention does not include X' to indicate his exclusion of X from the scope of his patent"). Lexicography or disavowal can be implied where, *e.g.*, the patentee makes clear statements characterizing the scope and purpose of the invention. *See On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006) ("[W]hen the scope of the invention is clearly stated in the specification, and is described as the advantage and distinction of the invention, it is not necessary to disavow explicitly a different scope."). Nonetheless, the plain meaning governs "[a]bsent implied or explicit lexicography or disavowal." *Trs. of Columbia Univ.*, 811 F.3d at 1364 n.2.

## III. CONSTRUCTION OF AGREED TERMS

The parties agreed to the constructions of the following terms/phrases:

| Claim Term/Phrase | Agreed Construction |
|---|---|
| "in attachment"  (Claim 1) | "attached (directly or indirectly)"" |
| "allow"  (Claim 1) | "permit" |

(Dkt. No. 104 at 2).[4] In view of the parties' agreement on the proper construction of the identified terms, the Court hereby **ADOPTS** the parties' agreed constructions.

During the claim construction hearing, the parties agreed to the construction of the following terms/phrases:

| Claim Term/Phrase | Agreed Construction |
|---|---|
| "a mechanical fastener"  (Claim 1) | Plain and ordinary meaning. |
| "the mechanical fastener configured to selectively attach the pair of wings together"  (Claim 1) | "the mechanical fastener designed to join the pair of wings together" |
| "the mechanical fastener including a lip extending along at least a portion of a perimeter of at least one wing of the pair of wings"  (Claim 1) | "the mechanical fastener including a raised edge extending along at least a portion of an outer boundary of at least one wing of the pair of wings" |
| "a mating portion along a perimeter of at least one other wing of the pair of wings, and wherein the mating portion and the lip are configured to align the at least one | "a mating portion along an outer boundary of at least one other wing of the pair of wings, and wherein the mating portion and the raised edge are designed to align the at least one wing relative |

---

[4] Citations to the parties' filings are to the filing's number in the docket (Dkt. No.) and pin cites are to the page numbers assigned through ECF.

| wing relative to the at least one other wing in the closed position" (Claim 1) | to the at least one other wing in the closed position" |
| --- | --- |
| "therebetween" (Claim 1) | "between the pair of wings" |
| "having a size configured for housing at least a portion of the medical needle" (Claim 8) | "having a size designed for housing at least a portion of the medical needle that includes the sharp tip" |
| "wherein the groove is formed in a single one of the pair of wings" (Claim 9) | "wherein the groove is formed in only one of the pair of wings" |

Regarding the term **"a mechanical fastener,"** the Court finds that this term is unambiguous, and is easily understandable by a jury, and should be given its plain and ordinary meaning. More importantly, the term is further limited and described by the surrounding claim language. Specifically, claim 1 recites that "the mechanical fastener [is] configured to selectively attach the pair of wings together." Accordingly, the term **"a mechanical fastener"** will be given its **plain and ordinary meaning**, as agreed to by the parties.

Regarding the phrase **"the mechanical fastener configured to selectively attach the pair of wings together,"** the parties originally disputed whether "selectively attach" should be construed to mean "join," as Defendant proposed. The Court first notes that the surrounding claim language recites that the pair of wings are "selectively positionable from an open position to a closed position, where the wings in the open position are spaced apart from each other to expose the medical needle to allow placement of the medical needle into a treatment site and delivery of a medicinal fluid, and wherein the wings in the closed position cover the medical needle to protect

against accidental needle stick injury from the medical needle." Thus, the claim language explicitly recites that the wings can move from an open to a closed position. The claim language further indicates that the mechanical fastener "selectively attach[es]" or joins the wings together "to protect against accidental needle stick injury from the sharp tip of the medical needle." Accordingly, the Court adopts the parties' agreed construction and construes the phrase **"the mechanical fastener configured to selectively attach the pair of wings together"** to mean **"the mechanical fastener designed to join the pair of wings together."**

Regarding the phrase **"the mechanical fastener including a lip extending along at least a portion of a perimeter of at least one wing of the pair of wings,"** the parties originally disputed whether the term "extending along at least a portion of" should be construed to mean "along at least part of," as Defendant originally proposed. The difference between Defendant's original proposal and the claim language is insignificant. Thus, it is unnecessary and potentially improper to replace the language chosen by the patentee with Defendant's preferred language. Accordingly, the Court adopts the parties' agreed construction and construes the phrase "**the mechanical fastener including a lip extending along at least a portion of a perimeter of at least one wing of the pair of wings,**" to mean **"the mechanical fastener including a raised edge extending along at least a portion of an outer boundary of at least one wing of the pair of wings."**

Regarding the phrase **"a mating portion along a perimeter of at least one other wing of the pair of wings, and wherein the mating portion and the lip are configured to align the at least one wing relative to the at least one other wing in the closed position,"** the parties originally disputed whether the phrase "align the at least one wing relative to the at least one other wing in the closed position" should be construed to mean "align the wings when closed," as Defendant originally proposed. The difference between Defendant's original proposal and the

claim language is insignificant. Thus, it is unnecessary and potentially improper to replace the language chosen by the patentee with Defendant's preferred language. Accordingly, the Court adopts the parties' agreed construction and construes the phrase **"a mating portion along a perimeter of at least one other wing of the pair of wings, and wherein the mating portion and the lip are configured to align the at least one wing relative to the at least one other wing in the closed position"** to mean **"a mating portion along an outer boundary of at least one other wing of the pair of wings, and wherein the mating portion and the raised edge are designed to align the at least one wing relative to the at least one other wing in the closed position"**

Regarding the phrase **"therebetween,"** the parties previously agreed that the term "therebetween" should be construed to mean "between the closed pair of wings." (Dkt. No. 95 at 1). Plaintiffs withdrew their previous agreement and proposed giving the term its plain and ordinary meaning. The Court notes that the parties' current agreed construction is consistent with the PTAB's decision in the IPR of the '476 Patent. Specifically, the PTAB construed the term "therebetween" to mean "between the pair of wings." (Dkt. No. 55-1 at 22-23). This construction drops "closed" from the parties' previously agreed construction. As discussed in the PTAB's decision, the surrounding claim language indicates that including "closed" in the construction is unnecessary. *Id.* Accordingly, the Court adopts the parties' agreed construction and construes the phrase **"therebetween"** to mean **"between the pair of wings."**

Regarding the phrase **"having a size configured for housing at least a portion of the medical needle,"** the parties originally disputed whether the portion of the medical needle housed or enclosed must include the sharp tip, as Defendant proposed. The Court finds that the intrinsic evidence explicitly indicates that the goal of the invention is protect against accidental needle sticks. Claim 1 recites that "the wings in the closed position cover the medical needle to protect

against accidental needle stick injury from the medical needle." Similarly, claim 8 recites that "the mechanical fastener [is] configured to selectively attach the pair of wings together with the medical needle positioned therebetween so as to protect against accidental needle stick injury from the sharp tip of the medical needle."

Likewise, the specification states that "[t]he present invention relates to a device, system and method for protecting a user from a sharp tip of a medical needle." '476 Patent at 1:23–25. The specification further states that when the sharp tip "is contaminated with blood or other fluids from the patient, it is considered a significant hazard." *Id.* at 1:32–33. In describing Figure 10, the specification discloses that "[g]roove 1044 may be sized for housing medical needle 206 after the pair of wings 216, 218 are attached to one another," and that the "attachment of the wings 216, 218 protects a user from sharp tip 212 of medical needle 206." *Id.* at 6:39–39; *see also, id.* at 1:44, 1:55–3:20, 4:36–40, 4:57, 5:58. Thus, the patentee explicitly indicated that the goal of the invention is to protect the user from the tip of the needle. Indeed, the title of the '476 Patent is "Sharps Protection Device for Protecting a User From a Sharp Tip of a Medical Needle." As indicated in the intrinsic evidence, the device accomplishes this goal by housing at least the sharp tip of the medical needle within the recited groove.

The parties also previously disputed whether the "groove" houses the needle, as Plaintiffs propose, or if it encloses the needle, as Defendant proposes. Defendant argues that the patentee amended claim 1 during prosecution to distinguish "the protective role of the wings from that of the groove within the wings." (Dkt. No. 101 at 31) (citing Dkt. No. 101-18 at 8). According to Defendant, "[i]f the wings are the portion of the device that 'covers' the needle, then the groove that is 'housing' the needle must do something else, because [the patentee] used a different word." *Id.* The Court disagrees with Defendant's characterization of the prosecution history.

During prosecution, the patentee amended claim 1 of the '476 Patent to recite that when the wings are in the closed position they protect against accidental needle stick. The patentee argued that "amended claim 1 requires that **the mating portion and the lip are configured to align the at least one wing relative to the at least one other wing <u>in the closed position</u>, wherein the wings in the closed position <u>cover the medical needle</u> to protect against accidental needle stick injury from the medical needle.**" (Dkt. No. 101-18 at 9) (emphasis in original). The patentee further argued that the prior art did not disclose the "closed position" limitation because the identified elements "do **<u>not</u>** interact with one another in the **<u>closed</u>** position of [the prior art]." *Id.* at 10 (emphasis in original). According to the patentee, the identified elements in the prior art "**only interact with one another to maintain the device in the <u>open</u> position.**" *Id.* at 10-11 (emphasis in original).

Contrary to Defendant's contention, the patentee did not distinguish the prior art based on "housing" meaning "enclosing." Indeed, claim 8 was not amended to include "housing." Instead, the patentee distinguished the prior art because it failed to cover the needle when in a closed position. This is not a clear or unmistakable disclaimer that requires construing "housing" to mean "enclosing." The extrinsic evidence cited by Defendant is also consistent with the intrinsic evidence, which defines "housing" as "something that covers or protects." (Dkt. No. 101 at 31 n. 37). Finally, Defendant's citation to the IPR and other patents does not compel redrafting the term "housing" as "enclosing." (Dkt. No. 101 at 33). Accordingly, the Court adopts the parties' agreed construction and construes the phrase **"having a size configured for housing at least a portion of the medical needle"** to mean **"having a size designed for housing at least a portion of the medical needle that includes the sharp tip."**

Regarding the phrase **"wherein the groove is formed in a single one of the pair of**

**wings,"** the Court notes that the PTAB in the IPR of the '476 Patent found that the prior art has "grooves formed in both of its wings, not just a *single one* of its wings." (Dkt. No. 55-1 at 70) (emphasis added). The PTAB concluded that the petitioner failed to "to adequately explain why a person having ordinary skill in the art would modify [the prior art's] dual groove system when combining its teachings with [other prior art] to arrive at the subject matter of claim 9." Thus, claim 9 was determined to be non-obvious based on the groove being formed in only one of the pair of wings. Accordingly, the Court adopts the parties' agreed construction and construes the phrase **"wherein the groove is formed in a single one of the pair of wings"** to mean **"wherein the groove is formed in only one of the pair of wings."**

## IV. CONSTRUCTION OF DISPUTED TERMS

The parties' dispute focuses on the meaning and scope of one term of the '476 Patent.

### 1. "groove"

| Disputed Term | Plaintiffs' Proposal | Defendant's Proposal |
|---|---|---|
| "groove" | "a long narrow cut" | "a long narrow depression" |

#### a) The Parties' Positions

The parties agree that the recited "groove" is a "long narrow" something. The parties dispute whether the "groove" is a "cut," as Plaintiffs propose, or a "depression," as Defendant proposes. Plaintiffs argue that its construction more closely follows the term's ordinary meaning. (Dkt. No. 98 at 22). In the alternative, Plaintiffs contend that the term is a commonly-used term that can be readily understood and does not require construction. *Id.*

Defendant responds that its construction finds support in extrinsic evidence. (Dkt. No. 101 at 21-22). Defendant argues that Plaintiffs' construction is embodied in the prior art, and would prevent the groove from achieving its claimed form and purpose of being "configured for housing

at least a portion of the medical needle." *Id.* at 26. Defendant contends that none of the small cuts illustrated in the Figure 1 prior art device is sufficient to qualify as a "groove" that is "configured for" or in any way corresponds to the size of the medical needle, as required by claim 8. *Id.* Defendant further contends that the "cuts" are also not capable of "housing at least a portion of the medical needle," as claim 8 also requires. *Id.* Defendant argues that a groove that is "configured" for "housing" a medical needle cannot be merely a "cut," as Plaintiffs propose. *Id.* at 27. According to Defendant, the size of the groove must at least approximate the size of the needle. *Id.* Defendant contends that "[a] minuscule 'cut' cannot do what the patent language requires, while a wider and deeper 'depression' is consistent with all evidence and the scope of the patent claim." *Id.*

Defendant further argues that its construction comports with the common usage of the term by those skilled in the art. *Id.* According to Defendant, the PTAB concluded that U.S. Patent No. 5,147,319 to Ishikawa et al. disclosed "grooves for housing at least a portion of the medical needle." (Dkt. No. 101 at 27) (citing Dkt. No. 55-1 at 29). Defendant also contends that its construction is consistent with the PTAB's interpretation of U.S. Patent 7,569,044 to Sasso. (*Id.* at 28) (citing Dkt. No. 55-1 at 31). Defendant further contends that the concept of a "groove" is also discussed in U.S. Patent No. 4,820,277 to Norelli. *Id.* (citing Dkt. No. 101-17). Finally, Defendant argues that "groove 1044" referenced by Plaintiffs in their claim construction chart is not shown in any figure or embodiment. *Id.* at 29. Defendant contends that a person of ordinary skill in the art would have to guess which "groove" in either wing is actually number 1044. *Id.*

Plaintiffs reply that "[t]he difference between a cut and a depression are small." (Dkt. No. 102 at 4). Plaintiffs contend that "a depression tends to connote a natural formation whereas a cut connoted a man (or woman) made article." *Id.* According to Plaintiffs, the groove that is formed

in the wing is man-made. *Id.*

For the following reasons, the Court finds that the term **"groove"** should be construed to mean **"a long narrow cut or depression."**

### b) Analysis

The term "groove" appears in claims 8 and 9 of the '476 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The Court further finds that in the context of the surrounding claim language, both "cut" and "depression" accurately capture the meaning of "groove." Indeed, the extrinsic evidence cited by Defendant defines "groove" as "a long narrow *cut or depression*, especially one made to guide motion or receive a corresponding ridge." (Dkt. No. 101 at 26) (citing the Oxford Online English Dictionary (US)) (emphasis added). Moreover, neither party has provided a persuasive reason to reject the other side's construction. Accordingly, the Court construes "groove" to mean "a long narrow cut or depression."

Defendant argues that "[a] groove that is 'configured' for 'housing' a medical needle cannot be merely a 'cut.'" (Dkt. No. 101 at 27). Defendant's argument, which quotes the claim language, indicates that the claim language itself defines the proper characteristics and requirements of the recited "groove." For example, claim 8 recites that the groove has "a size configured for housing at least a portion of the medical needle." If the recited groove is "merely a cut" that cannot house "at least a portion of the medical needle," as recited in the claim, then it would not fall within the scope of the claims. Thus, Defendant's concern with Plaintiffs' construction is addressed by the claim language itself.

### c) Court's Construction

The Court construes the term **"groove"** to mean **"a long narrow cur or depression."**

## V. CONCLUSION

The Court adopts the above constructions. The parties are ordered to not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any part of this opinion, other than the definitions adopted by the Court, in the presence of the jury. However, the parties are reminded that the testimony of any witness is bound by the Court's reasoning in this order but any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**It is SO ORDERED.**

**SIGNED this 4th day of March, 2019.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE