**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| EMED TECHNOLOGIES CORPORATION,<br><br>*Plaintiff*,<br><br>v.<br><br>REPRO-MED SYSTEMS, INC. D/B/A RMS MEDICAL PRODUCTS,<br><br>*Defendant*. | § § § § § § § § § § § § |

Case No. 2:15-CV-01167-JRG-RSP

**REPORT AND RECOMMENDATION**

Plaintiff EMED Technologies Corporation ("EMED") filed this patent infringement lawsuit against Defendant Repro-Med Systems, Inc. ("Repro-Med") on June 25, 2015, alleging that Repro-Med infringed U.S. Patent No. 8,961,476 (the "'476 Patent") by incorporating the patented technology into its "HIgH-Flo Subcutaneous Needle Sets™" ("Accused Products"). (Dkt. No. 1)

The only remaining valid claim of the '476 Patent is dependent claim 9, which depends from claim 8, which in turn depends from independent claim 1. (*See* Dkt. Nos. 55 and 64).[1] Repro-Med moves for summary judgment on the basis that there is no evidence that the Accused Products contain each limitation of claim 9 either literally or under the doctrine of equivalents. Repro-Med therefore argues that EMED lacks sufficient facts to show infringement of the '476 Patent.

---

[1] On January 12, 2017, the PTAB invalidated independent claim 1 and dependent claims 2-8 and 10 of the '476 Patent. (Patent Tr. & App. Bd. Jan. 12, 2017) (the "IPR") (Dkt. No. 55-1).

## BACKGROUND

The '476 Patent is entitled "Sharps Protector Device for Protecting a User from a Sharp Tip of a Medical Needle." The application leading to this patent was filed on March 21, 2014, and the patent was issued on February 24, 2015. The '476 Patent relates to a device, system, and method that protects a person from the sharp tip of a medical needle. '476 Patent at 1:23-24. The abstract of the '476 Patent provides:

> A device for protecting a user from a sharp tip of a medical needle includes a central body portion, a medical needle having a sharp tip, a pair of wings in attachment to the central body portion, and a mechanical fastener disposed on at least one of the wings. The mechanical fastener is configured to selectively attach the wings together with the medical needle positioned between the wings so as to protect a user from the sharp tip of the medical needle. In another embodiment, a sharp tip of a medical needle is withdrawn from a patient, a pair of wings with the medical needle positioned in between is closed, and the wings are fastened together with the medical needle positioned between the wings so as to protect a user from the sharp tip of the medical needle.

Figure 10, pictured below, illustrates an embodiment of the device that includes a central body portion 202 in fluid connection with a delivery tube 204, medical needle 206, and a pair of wings 216, 218. *Id.* at 4:62–5:5. The figure also illustrates a mechanical fastener "having a lip and a recessed portion configured to engage for attachment with one another, and with a groove sized to house the medical needle." *Id.* at 3:62–65.



FIGURE 10

*Id.* at Figure 10. Specifically, device 1000 "may include a mechanical fastener 1024 with one or both of the wings 216, 218 forming a recessed portion 1038 adjacent a perimeter 1040." *Id.* at 6:19–22. The specification further states that "[m]echanical fastener 1024 may also include a lip 1042 extending from at least a portion of perimeter 1040 of one or both of the wings 216, 218." *Id.* at 6:22–24. The specification adds that "[r]ecessed portion 1038 and lip 1042 may be configured to engage with one another to selectively attach the pair of wings 216, 218 together with medical needle 206 positioned between wings 216, 218." *Id.* at 6:24–27. It is "[t]his attachment of the wings 216, 218 [that] protects a user from sharp tip 212 of medical needle 206." *Id.* at 6:27–29.

Claims 1, 8, and 9 of the '476 Patent recite the following elements:

> 1. A device for protecting a user from a sharp tip of a medical needle, the device comprising:
> a central body portion;
> the medical needle having a first end in fluid connection with a delivery tube, and a second end distal from the central body portion including the sharp tip;
> a pair of wings, each wing of the pair of wings having an inner region and an outer region, the inner region of each wing in

> attachment to the central body portion, the outer region of each wing extending away from the central body portion, the pair of wings disposed in opposition to one another with the medical needle positioned therebetween, and the pair of wings being selectively positionable from an open position to a closed position, where the wings in the open position are spaced apart from each other to expose the medical needle to allow placement of the medical needle into a treatment site and delivery of a medicinal fluid, and wherein the wings in the closed position cover the medical needle to protect against accidental needle stick injury from the medical needle;
>
> a mechanical fastener disposed on at least one wing of the pair of wings, the mechanical fastener configured to selectively attach the pair of wings together with the medical needle positioned therebetween so as to protect against accidental needle stick injury from the sharp tip of the medical needle;
>
> the mechanical fastener including a lip extending along at least a portion of a perimeter of at least one wing of the pair of wings, and a mating portion along a perimeter of at least one other wing of the pair of wings, and wherein the mating portion and the lip are configured to align the at least one wing relative to the at least one other wing in the closed position.
>
> 8. The device in accordance with claim 1, wherein at least one of the pair of wings is formed with a groove having a size configured for housing at least a portion of the medical needle when the pair of wings are in the closed position.
>
> 9. The device in accordance with claim 8, wherein the groove is formed in a single one of the pair of wings.

The Court previously issued a Claim Construction Memorandum Opinion and Order, providing constructions for nine agreed constructions and a single disputed claim term. (Dkt. No. 109). Three constructions are relevant to the disposition of Repro-Med's summary judgment motion. First, the Court construed the sole disputed term – "groove," which appears in claims 8 and 9 – to mean "a long narrow cut or depression." (*Id.* at 18). Second, the Court adopted the parties' agreed construction for the phrase "wherein the groove is formed in a single one of the pair of wings," which appears only in claim 9, to mean "wherein the groove is formed in only one

4

of the pair of wings." (*Id.* at 15-16). Third, the Court adopted the parties' agreed construction for the phrase "having a size configured for housing at least a portion of the medical needle" to mean "having a size designed for housing at least a portion of the medical needle that includes the sharp tip." (*Id.* at 15).

Repro-Med contends that the Accused Products differ in construction with respect to the needle, which can be 24 or 26 gauge, the exposed length of the needle measured from the housing to the sharp tip, which may be 4, 6, 9, 12, or 14 mm, and the numbers of needles that are attached to a common delivery tube, which may be from one to six needles. (Dkt. No. 121 at 7). Repro-Med provides the following description of the Accused products:

> [E]ach wing (E) has a needle facing surface that includes a smooth rectangular section (A) interposed between two thinned areas (B and C). A first thinned area (B) is provided between the housing (D) and the wing (E), thereby allowing each wing (E) to move between open and closed positions. A second thinned area (C) is provided between the rectangular section (A) and the outer section (F) of the wing (E) bearing the plug (G) and the wing (E) bearing the socket (H). This second thinned area (C) allows the outer section (F) of each wing (E) to bend relative to its adjacent smooth rectangular section (A), allowing the plug (G) and the socket (H) to engage and thereby lock the wings together in the closed position about the medical needle. Each of the rectangular surface sections (A) have a ridge (I) adjacent the second thinned area (C), the ridge (I) extending perpendicular to the length (J) of the medical needle extending from the housing. Labels corresponding to these structures are provided.

(*Id.* at 8)-9). Repro-Med provides the following diagrams of the Accused Products:[2]

---

[2] EMED objects to these photos on the basis that the attorney declaration attached to Repro-Med's motion fails to show the attorney's personal knowledge for authenticating these photos. (Dkt. No. 126 at 15). The Federal Rules of Civil Procedure expressly contemplate objections to facts that are not supported by admissible evidence. *See* Fed. R. Civ. P. 56 (c)(2). To overcome such objections, the proponent of the fact must show that the material is admissible as presented or must explain the admissible form that is anticipated. *See Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017), *as revised* (July 5, 2017) ("The district court dismissed Captain Jamison's report solely because it was not sworn without considering Lee's argument that Captain Jamison would testify to those opinions at trial and without determining whether such opinions, as testified to at trial, would be admissible."); *see also* Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment ("The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated."). Repro-Med responds by stating, *inter alia*, that the





(*Id.* at 9). The below picture illustrates the Accused Products having an exposed needle length (J) of 9 mm and shorter.

---

photos can be readily authenticated at trial, by offering an additional declaration from the attorney, and by offering a declaration from Repro-Med's Chief Operating Officer, Manuel Marques. (Dkt. No. 130). The Court construes these submissions as a showing of the anticipated authentication of the photos. Further, the Court understands that Repro-Med may call Manuel Marques as a witness at the upcoming trial. (*See id.*). The Court thus **OVERRULES** EMED's objection.



The below picture illustrates the Accused Products having an exposed needle length (J) of 12 mm and shorter.



The below pictures illustrate the Accused Products having an exposed needle length (J) of greater than12 mm.

  

Repro-Med asserts that these devices[3] do not infringe claim 9 of the '467 Patent either literally or under the doctrine of equivalents.

## LEGAL STANDARDS

Summary judgment is appropriate when "the pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact by either (1) presenting evidence that affirmatively demonstrates the absence of any genuine issue of material fact, or (2) after adequate time for discovery, demonstrating that "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party meets this burden, the nonmoving party cannot defeat summary judgment by resting on mere denials or

---

[3] EMED contends that the attorney declaration "does not state… that the six purported ... items … depict every Accused Instrumentality." (Dkt. No. 126 at 16). EMED argues that Repro-Med essentially "concedes" that all Accused Products' structures "are not in evidence" because Repro-Med characterizes these devices as "representative." *Id.* However, a review of EMED's infringement contentions (Dkt. No. 67-5) shows that EMED itself relied upon "representative" products for 59 Accused Products. (*See* Dkt. No. 67-5 at Ex. A. ("'E.g.' is used in this chart to reflect that the cited information is representative of the Accused Instrumentalities.")). This argument is frivolous.

allegations, but must set forth specific facts sufficient to raise a genuine issue of fact. *Id*. at 324. In examining the record, the court should do so in the light most favorable to the party opposing summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

To prove direct infringement, a patentee must establish, by a preponderance of the evidence, that one or more claims of the patent read on the accused device literally or under the doctrine of equivalents. *See Advanced Cardiovascular Sys., Inc., v. Scimed Life Sys., Inc.*, 261 F.3d 1329, 1336 (Fed Cir. 2001).

Generally, a claim is literally infringed if each properly construed claim element reads on the accused product. *Allen Eng'g Corp. v. Bartell Indus.*, 299 F.3d 1336, 1345 (Fed. Cir. 2002). Determining whether a product or method literally infringes a patent is a two-step process. *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1319 (Fed. Cir. 2012). First, the Court must determine the proper construction of the asserted claims, which is a matter of law. *Id.* This step was completed in the Court's Claim Construction Order (Dkt. No. 109). Second, the finder of fact must determine whether the asserted claim, as properly construed, reads on the product or method. *Id.* In other words, "a patentee must supply sufficient evidence to prove that the accused product or process contains . . . every limitation of the properly construed claim." *Seal-Flex, Inc. v. Athletic Track and Court Const.*, 172 F.3d 836, 842 (Fed. Cir. 1999).

Even if one or more of the claim limitations are not literally present in the accused device, thus precluding a finding of literal infringement, the claim may still be held infringed if equivalents of those limitations are present. *Id.* The doctrine of equivalents is applied to the individual elements of the claimed invention for which literal infringement is not found. *Warner-Jenkinson Co. v. Hilton Davis Cem. Co.*, 520 U.S. 17, 29 (1997).

## DISCUSSION

Repro-Med argues that it is entitled to summary judgment because it can show that EMED lacks sufficient facts to establish that claim 9 reads on the Accused Products literally or under the doctrine of equivalents. Repro-Med contends there are no genuine issues of material fact as to (1) literal infringement because neither wing in the accused products has a groove for housing any portion of the medical needle, and (2) the doctrine of equivalents because the Accused Products do not contain an equivalent of each limitation of claim 9 of the '476 Patent.

### A. Literal Infringement

Repro-Med contends that the Accused Products do no not literally infringe claim 9 of the '476 Patent because neither wing of the Accused Products have (1) a groove, (2) a groove having a size designed for housing at least a portion of at least a portion of the medical needle length, (3) a groove having a size designed for housing at least a portion of the medical needle length that includes the sharp tip, or (4) a groove formed in only one pair of the wings. (Dkt. No. 121 at 16).

Instead, Repro-Med argues, the Accused Products differ from the instrumentalities claimed by the '476 Patent in three ways: (1) the wing surfaces of the Accused Products have smooth surfaces with a projecting ridge that may contact a needle having an exposed length of the 9 mm or longer; (2) for Accused Products having a needle length of 4, 6, 9, or 12 mm, the needle tip does not extend beyond the second thinned areas when the wings are locked together, and thus the needle length is only covered by the locked wings; and (3) for Accused Products having a needle length of 14 mm, the needle tip is sandwiched between the outer portions when the wings are locked together, and the needle tip may or may not abut the plug or the socket. (*Id.* at 16-17). Thus, according to Repro-Med, in no event is any portion of the exposed needles or needle tip housed within any groove in either wing because no groove exists in the Accused Products. (*Id.* at 17).

Further, Repro-Med argues, the identified structures alleged to be a groove in the Accused Products cannot physically come into contact with the needle length when the wings are in the closed position. (*Id.* at 19).

EMED contends that the Accused Products do have a groove because the groove and mechanical fastener limitations do not have to be separate structures –the groove limitation and the mechanical fastener limitation are one in the same. (*See* Dkt. No. 126 at 14). EMED offers no explanation as to why these structures are the same beyond citing *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1311–12 (Fed.Cir.2005) (abrogated on other grounds, *see IRIS Corp. v. Japan Airlines Corp.*, 769 F.3d 1359, 1361 n. 1 (Fed.Cir.2014)). (*Id.*). However, EMED's infringement contentions provide the clearest depiction of EMED's arguments:



(*See* Dkt. No. 67-5 at Ex. A). Here, EMED contends that the groove element are the encircled items on the Accused Products. (*See* Dkt. No. 137 at 2).

Based on the parties briefing, there are two issues to resolve in determining whether Repro-Med's Accused Products literally infringe the '476 Patent: (1) whether the claim language requires the groove and mechanical fastener limitations to be separate structures, and (2) whether there is

a groove present in either wing of the Accused Products. For the reasons set forth below, the Court finds that the answer to the first inquiry is "yes," the answer to the second inquiry is "no," and Repro-Med has successfully carried its summary judgment burden establishing the absence of a genuine fact dispute as to literal infringement.

### 1. The Groove and Mechanical Fastener Limitations are not met.

In applying the claims as construed by the Court to the Accused Products, neither the groove limitation nor the mechanical fastener limitation is met in the accused products either in structure or function.

The claims of the patent define a "mechanical fastener" as "including a lip extending along at least a portion of the perimeter of at least one wing of the pair of wings, and a mating portion along a perimeter of at least one other wing of the pair of wings, and wherein the mating portion and the lip are configured to align the at least one wing relative to the at least one other wing in the closed position." *See* '476 Patent at 14:15-21. This is in contradistinction to "groove," which this Court has construed as "a long narrow cut or depression." (Dkt. No. 109 at 18). According to Claim 9, the sole remaining claim in this lawsuit, the groove is "formed in a single one of the pair of wings." *See* '476 Patent at 14:39-40. This Court has construed "wherein the groove is formed in a single one of the pair of wings" to mean "wherein the groove is formed in only one of the pair of wings." (Dkt. No. 109 at 16). Thus, the groove has to be in only *one* wing, whereas the components of the mechanical fastener must be located on at least a portion of the perimeter of *both* wings.

The specification points out that "device 1000 (FIG. 10) may include a mechanical fastener 1024 with one or both of the wings 216, 218 forming a recessed portion 1038 adjacent a perimeter 1040. Mechanical fastener 1024 may also include a lip 1042 extending from at least a portion of

perimeter 1040 of one or both of the wings 216, 218. Recessed portion and lip 1042 may be configured to engage with one another to selectively attach the pair of wings 216, 218 together with *medical needle* 206 *positioned between wings* 216, 218." *See* '476 Patent at 6:18-26 (emphasis added). This is in contradistinction to the specification stating that a "[g]roove 1044 may be sized for *housing medical needle* 206 after the pair of wings 216, 218 are attached to one another." *Id.* at 6:35-37 (emphasis added). Whereas the medical needle 206 is simply positioned between the wings when the medical fastener closes the wings, the groove houses the needle.

Thus, EMED cannot show there is a material issue of fact in terms of the structural limitations. Even if the alleged mechanical fastener in the Accused Products were also the groove, this limitation would not be met because the groove has to be in one wing, not both as encircled in the above image, and the needle must be housed in the groove, not merely positioned between the wings.

Even if EMED's argument is accepted that the mechanical fastener and groove are the same, this construction would cut against the required function of the groove and the mechanical fastener. Claim 9 requires the groove to perform a certain function – housing at least a portion of the needle when the wings are in the closed position. *See* '476 Patent at 14:337-38. In contrast, claim 1, from which claim 9 depends, requires the mechanical fastener to perform a specific function – to selectively attach the pair of wings together. *See id.* at 14:11. In the Accused Products, there is no space to house anything, much less a medical needle, in the mechanical fastener once the fastener is closed. At most, a 14 mm medical needle tip abuts the plug in one wing of the Accused Products. (*See* Dkt. No. 121-12); *supra* 8. EMED does not set forth specific facts to show how abutting equates to housing. Accordingly, there is no genuine dispute that the Accused Products' alleged mechanical fastener does not meet the limitations of a groove.

### 2. A Groove is Not Present in Either Wing of the Accused Products.

Other than the plug and socket on the Accused Products, EMED points to no other structure that meets the groove limitations of the '476 Patent. Clearly, there is no groove in either wing of the Accused Products, even if one were to disregard the socket and plug. This Court has construed "groove" to mean "a long narrow cut or depression." (Dkt. No. 109 at 18). EMED points to no long narrow cut or depression on either wing of the Accused Products. Thus, there is no genuine dispute that there is not a groove in either wing of the Accused Products.

Repro-Med has carried its burden in showing the absence of a genuine issue of material fact. Because EMED has not set forth specific facts to create a fact dispute as to whether the Accused Products literally infringe the '476 Patent, Repro-Med is entitled to summary judgment on this basis.

### B. Doctrine of Equivalents

Under the doctrine of equivalents, "a product or process that does not literally infringe a patent may nevertheless be held to infringe 'if it performs substantially the same function in substantially the same way to obtain the same result.'" *Duncan Parking Techs., Inc. v. IPS Grp.*, *Inc.*, 914 F.3d 1347, 1362 (Fed. Cir. 2019) (quoting *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950)). The doctrine of equivalents cannot be used to effectively read out a claim limitation because the public has a right to rely on the language of patent claims. *See Duncan Parking Techs.*, 914 F.3d at 1362 (citing *Primos, Inc. v. Hunter's Specialties, Inc.*, 451 F.3d 841, 850 (Fed. Cir. 2006) and *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1538 (Fed. Cir. 1991)).

Repro-Med contends that EMED cannot recapture, by application of the doctrine of equivalents, "an embodiment having a pair of wings having a mechanical fastener with a

cylindrical plug and socket for locking the wings together but without any groove in the wings." (Dkt. No. 121 at 24). Repro-Med contends that claim 9 of the '476 Patent is directed solely to the particular disclosed embodiment of a pair of wings having a mechanical fastener with a groove in one single wing. (*Id.*). Thus, the unclaimed alternative embodiments – (1) a pair of wings with the same mechanical fastener but without any groove in either wing, or (2) a pair of wings without any groove and a different mechanical fastener that has a single cylindrical pin projecting from one wing and engaging a single orifice in the other wing, or a plurality of pins engaging a corresponding plurality of orifices – are dedicated to the public. (*Id.* at 23-24).

EMED argues that the Accused Products infringe under the doctrine of equivalents because the "application of the doctrine of equivalents here does not involve a complete removal of the groove limitation but rather equivalent substitutes." (Dkt. No. 126 at 19). EMED appears to contend that there is a "genuine factual issue that the accused device incorporates an equivalent structure that is an insubstantial difference." (*Id.* at 22). In its sur-reply, EMED clarifies that the mechanical fastener circled on the Accused Products is the groove in Claim 9 under the doctrine of equivalents, but does not describe how the Accused Products perform the same function in substantially the same way to obtain the same result as the claimed device. (Dkt. No. 137 at 2).

The Court agrees with Repro-Med that the mechanical fastener in the Accused Products does not work in the same way as the as the claimed invention. The '476 Patent claims fundamentally distinguish the groove from the mechanical fastener. *See, e.g.*, '476 Patent 14:9-14, 36-38. Holding that the Accused Products infringes the '476 Patent claims under the doctrine of equivalents would essentially void the claim limitations of a "groove having a size configured for housing at least a portion of the medical needle when the pair of wings are in the closed position" and "wherein the groove is formed in a single one of the pair of wings." *Id.* at 14:36-41. EMED's

doctrine of equivalents argument thus requires vitiating a claim limitation. *See Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997).

The Court is unclear as to whether EMED is contending that the plug and socket on the Accused Products are the equivalent to the mechanical fastener on the claimed device. However, if such were the case, the Accused Products still lack an equivalent to the claimed groove because the plug and socket on the Accused Products and the mechanical fastener in the claimed device have structural differences that constitutes a "clear, substantial difference or difference in kind." *Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1361 (Fed. Cir. 2005); *see also Conopco, Inc. v. May Dep't Stores Co.*, 46 F.3d 1556, 1562 (Fed. Cir. 1994) ("The doctrine of equivalents cannot be used to erase 'meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement.'" (quoting *Pennwalt Corp. v. Durand-Wayland, Inc.*, 833 F.2d 931, 935 (Fed. Cir. 1987))). Allowing EMED to "greatly expand the scope" of the '476 Patent claims to cover the plug and socket without any regard for a groove would "disservice the members of the public who seek to avoid infringing those claims." *Duncan Parking Techs.*, 914 F.3d at 1362. In short, the Accused Products are simply not equivalent to the '476 Patent claims.

Repro-Med has carried its burden in showing the absence of a genuine issue of material fact. Because EMED has not set forth specific facts to create a fact dispute as to whether the Accused Products infringe the '476 Patent under the doctrine of equivalents, Repro-Med is entitled to summary judgment on this basis.

## CONCLUSION AND RECOMMENDATION

There is no genuine dispute of fact that the Accused Products do not contain each limitation of claim 9 literally or under the doctrine of equivalents. Thus, the Court recommends that Repro-

Med's motion for summary judgment of non-infringement (Dkt. No. 121) be **GRANTED** and that this case be **DISMISSED**.[4]

**SIGNED this 24th day of June, 2019.**

```
_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE
```

---

[4] A party's failure to file written objections to the findings, conclusions, and recommendations contained in this report within fourteen days after being served with a copy shall bar that party from *de novo* review by the district judge of those findings, conclusions, and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings, and legal conclusions accepted and adopted by the district court. Fed. R. Civ. P. 72(b)(2); see *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1430 (5th Cir. 1996) *(*en banc).